IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALBERT EINSTEIN MEDICAL            :
CENTER, INC., successor in interest  :
to Germantown Hospital and Medical  :
Center, Inc.,                       :
                                    :
          Plaintiff,                :
                                    :     CIVIL ACTION NO. 04-6059
     v.                             :
                                    :
MICHAEL O. LEAVITT, as Secretary    :
of the United States Department of  :
Health and Human Services,          :
                                    :
          Defendant.                :

**FILED**

AUG - 1 2007

**MICHAEL E. KUNZ, Clerk**
By_____Dep. Clerk

## MEMORANDUM

Presently before the Court are Plaintiff Albert Einstein Medical Center, Inc.'s Motion for

Summary Judgment (Docket No. 20), Defendant Michael O. Leavitt's Motion for Summary

Judgment (Docket No. 22), Plaintiff's Response in Opposition to Defendant's Motion for

Summary Judgment (Docket No. 24) and Defendant's Reply Memorandum (Docket No. 27).

The Court also considered all of the notices of supplemental authorities subsequently submitted

by both parties (Docket Nos. 28, 29, 30, 31 and 32).  For the reasons set forth below, Defendant's

Motion for Summary Judgment is granted.

## I.    BACKGROUND

This dispute concerns Medicare reimbursement for depreciation costs incurred in

furnishing services to Medicare Beneficiaries.  The facts of this case involve the merger of

Germantown Hospital and Medical Center ("Old Germantown" or "the Provider") into

Germantown Hospital and Community Health Service ("New Germantown"), a subsidiary of the

1

Albert Einstein Healthcare Network ("AEHN"). Albert Einstein Medical Center, Inc.[1]

("Plaintiff" or "Einstein"), acting as the successor in interest to Old Germantown, seeks a

reversal of the decision by the Centers for Medicare and Medicaid Services ("CMS" or

"Administrator") denying reimbursement for Old Germantown's claim of loss resulting from its

merger with Einstein. The Administrator denied the claim based on his finding that the merger

was between related parties and that the transfer of assets did not meet the regulatory requirement

of a "bona fide sale." Before analyzing the claims presented, the Court will engage in a brief

overview of the statutory and factual background of this case.

### A.    Statutory and Regulatory Background

Title XVIII of the Social Security Act ("Medicare"), 42 U.S.C. § 1395 et seq., establishes

a program of health insurance for the aged and disabled. It is administered on behalf of the

Secretary by CMS.[2] Pursuant to Part A of the Medicare program, the federal government

reimburses health care providers for the "reasonable costs"of providing covered services to

Medicare program beneficiaries. 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 413.9. "Reasonable

costs" are "costs actually incurred," less any costs "unnecessary in the efficient delivery of

needed health services." 42 U.S.C. § 1395x(v)(1)(A). The Medicare Statute assigns the Secretary

the role of promulgating regulations regarding what types of costs are reasonable and thus

reimbursable by Medicare. 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9. The Secretary has

---

[1] Due to continuing losses, on July 1, 1999, New Germantown merged into Albert Einstein Medical Center, a subsidiary of AEHN. The assets of New Germantown passed by operation of law to the Plaintiff Albert Einstein Medical Center, Inc. (Pl. Memo, Docket No. 21, at 15 n.9).

[2] CMS was formerly known as the Health Care Financing Administration ("HCFA").

2

also issued various manuals intended to advise providers and fiscal intermediaries of the Secretary's interpretations of the Medicare statute and regulations, including the Provider Reimbursement Manual ("PRM") and Medicare Intermediary Manual ("MIM").

The depreciation of buildings and equipment used in the provision of patient care is a reasonable cost for which the provider is reimbursed. 42 C.F.R. § 413.134(a). An asset's annual depreciation is calculated by prorating the historical cost, i.e. the cost incurred by the provider in acquiring the asset, over the asset's estimated useful life. Id. § 413.134(a), (b). CMS annually reimburses providers for a percentage of the asset's depreciation equal to the percentage used for the care of Medicare patients. The historical cost, less previously claimed depreciation allowances, is termed the "net book value" of the asset. See 42 C.F.R. § 413.134(b)(9). Because the depreciation payments were only estimates of the asset's actual declining value, the disposal of a depreciable asset sometimes resulted in a gain or loss to the provider, i.e. if the asset was sold for a greater/lesser amount than the net book value. Id. § 413.134(f)(1). The treatment of the gain or loss under the Medicare program depended upon the manner of disposition of the asset. Id. At the time relevant to this case, a loss from the bona fide sale of a depreciable asset was an allowable cost for which the provider was reimbursed. Id. § 413.134(f)(2)(i).[3]

Where a provider disposed of its Medicare assets through a merger, it could claim reimbursement for a purported loss for depreciation only where the merger was not between "related parties." In relevant part, 42. C.F.R. 413.134(k)(2)(i)[4] provides:

---

[3] Under this regulation the allowance for adjustments in depreciation costs is limited to assets disposed of prior to December 1, 1997. Gains or losses are not recognized for sales or scrapping which occurred after December 1, 1997. See also 42 U.S.C. § 1395x(v)(1)(O).

[4] Formerly known as section 413.134(l)(2)(i).

3

Statutory merger between unrelated parties. If the statutory merger is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the merger corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. If the merger corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated deprecation and the realization of gains and losses.

42 C.F.R. § 413.134(k)(2)(i) ("Statutory Merger Regulation"). In determining whether two parties are unrelated, the statutory merger regulation references 42 C.F.R. § 413.17 ("Related Party Rule"). Section 413.17 defines "related to the provider" as meaning that the provider "to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities or supplies." Id. § 413.17(b)(1). "Control" is defined as existing where an individual or organization "has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." Id. § 413.17(b)(3).

A provider may dispose of depreciable assets through sale, scrapping, exchange, trade-in, demolition, abandonment, condemnation, fire, theft or other casualty. 42 C.F.R. § 413.134(f)(1). The manner of disposition determines how the gain or loss is treated. Paragraphs (f)(2) through (6) specify the conditions under which the disposal of depreciable assets may result in a gain or loss under the Medicare program. See Id. Under 42 C.F.R. § 413.134(f)(2)(i), gains and losses realized from the bona fide sale or scrapping of depreciable assets are included in the determination of allowable costs. The CMS clarified the term "bona fide sale" as: "contemplat[ing] an arm's length transaction between a willing and well-informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest." Provider

4

Reimbursement Manual ("PRM"), Part 1, HCFA Pub. 15-1 Transmittal No. 415 (May 1, 2000).[5]

To obtain reimbursement from Medicare, health care providers must file annual cost reports with their fiscal intermediary. 42 C.F.R. §§ 413.20(b), 413(24)(f). The intermediary audits the report and issues a Notice of Amount of Medicare Program Reimbursement ("NPR"), informing the provider of the amount of reimbursement for that fiscal year. Id. § 405.1803. If the provider is not satisfied with the intermediary's decision, it may file an appeal with the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395oo(a). Once the PRRB issues its decision, the CMS may elect to review the decision, which would constitute the final decision of the agency. Id. § 1395oo(f)(1). The provider may seek review of the final decision of the PRRB, or of the reversal, affirmation, or modification by the CMS Administrator of a PRRB decision in federal district court. Id.

**B.    Factual and Administrative History**

Prior to the merger at issue, Old Germantown was a non-profit corporation[6] that operated an acute care hospital in the Germantown area of Philadelphia, Pennsylvania. In order to respond to competitive pressures in the Philadelphia health care market[7] and to stave off continuing losses,[8] Old Germantown began to seek proposals from third parties for a merger or sale of its

---

[5] For this document, see the Administrative Record ("A.R.") at 1684-1686.

[6] Its sole corporate member was Germantown Hospital and Medical Center Foundation. (A.R. 135).

[7] Old Germantown had lost two primary care physician groups (A.R. 151), and was having difficulty retaining specialists (A.R. 121-22). Old Germantown also saw a decline in admissions - only operating 125-150 of its 255 licensed beds. (A.R. 121)

[8] David Ricci, the president and CEO of Old Germantown at the time of the merger, testified that Old Germantown was "experiencing losses on a yearly basis, and as a result we felt

5

assets. (A.R. 125). On December 10, 1996, Old Germantown sent out a request for proposals

("RFP") to all of the existing healthcare systems in Philadelphia. (A.R. 126, 489-519).

The RFP expressed Old Germantown's desire to pursue a transaction "which may involve

the change in control or sale of [Old] Germantown." (A.R. 498). The RFP also identified Old

Germantown's primary objectives, including continuing to serve the community's health care

needs, enhancing health care services, maintaining its workforce, achieving a fair value for its

business and assets, and consummating the transaction expeditiously. (A.R. 498). Old

Germantown received proposals for affiliation from Einstein (A.R. 534-58), Temple University

("Temple") (A.R. 530-32), and Primary Health System ("Primary") (A.R. 523-28).

Primary proposed to purchase all of the assets of Old Germantown for $15 million, plus

inventory and prepaids. (A.R. 527). Under Primary's proposal, Old Germantown would have

retained its interest in its monetary assets, including its endowment funds, and retained liability

for its debts. (A.R. 523-28). Both Temple and Einstein proposed mergers, with Old

Germantown merging into a subsidiary which would assume all of its assets and liabilities. (A.R.

532, 539). Under Einstein's proposal, members of the Old Germantown Board could continue to

serve on the board of the new entity, and Germantown's management would continue to

participate in establishing policy for the new entity. (A.R. 535). In addition, Einstein would

commit funds to ensure continued access to health services in the community. (A.R. 536).

The Old Germantown Board established a special sub-committee to analyze the

proposals. (A.R. 126). The committee presented its findings at a board meeting on January 28,

that we needed to find an alternative partner to work with because we were not going to make it
on our own, we did not believe." (A.R. 122)

6

1997. (A.R. 2072). The committee reported that it had determined that the PHS proposal "does not match as well" with Old Germantown's objectives. (A.R. 2072). First, Old Germantown did not believe that it could use its endowment funds to pay off its liabilities, and thus did not consider Primary's offer "bona fide" in the sense that the value was not real. (A.R. 127). In addition, due to the fact that Primary was not yet well-positioned in the Philadelphia area, Old Germantown worried that the deal would not be consummated expeditiously. (A.R. 127). Consequently, Old Germantown decided to pursue further discussion with only Einstein and Temple. (A.R. 2072-73).

Old Germantown ultimately elected to pursue an affiliation with Einstein, and on February 28, 1997, the president of Einstein wrote a letter of intent to Old Germantown's president reflecting the terms of their tentative agreement. (A.R. 570-78). The letter provided that Old Germantown would merge into a subsidiary of Einstein, and Einstein would assume all of Old Germantown's liabilities and assets. The composition of the new entity's board and management was discussed, including preserving the current President and CEO's role and allowing for the appointment of board members to the new entity from Old Germantown's current board and medical staff.[9] (A.R. 572-73). Einstein also committed $6 million to be used to "increase services to the community and insure continued access by the community to healthcare services." (A.R. 573). However, until the Definitive Agreement was signed, either party could have walked away from the deal. (A.R. 130, 575).

The Definitive Agreement was signed May 30, 1997. (A.R. 592-729). Consistent with

---

[9] The letter noted that the "above stated board composition shall be subject to the parties' intentions to maximize Medicare recapture." (A.R. 572).

7

the parties' discussions, the Agreement provided for the merger of Old Germantown into a corporation created by Einstein, with the newly created entity assuming all of Old Germantown's assets and liabilities. (A.R. 130, 602-03). Under the Agreement, the new entity would be governed by a board of trustees comprised of 40 members. (A.R. 605). Specifically, the board was to include: (1) four members chosen from the Old Germantown Board; (2) three members chosen from the medical staff; (3) the president and CEO of Old Germantown at the time of closing; (4) up to 12 members, who have never previously served on the Old Germantown board, appointed from the Germantown community; and (5) up to twenty members appointed by Einstein. (A.R. 605).

Einstein incorporated the new entity, Germantown Hospital and Community Health Services (what has been referred to as "New Germantown"), on June 24, 1997 and was its sole corporate member. (A.R. 2254, 2268). Completion of the merger occurred August 31, 1997. (A.R. 766). Consistent with the parties' agreement, New Germantown had a board of 40 members, 6 of whom (15%) had been on the Old Germantown board. (A.R. 136). Seven members (5.5%) of Old Germantown's board became members of Einstein's 127 member board. (A.R. 136). Two members (10%) of Old Germantown's board served on the 20 member executive committee, which exercised primary decision making for the entire Einstein health system. (A.R. 136-37). According to David Ricci, the President and CEO of Old Germantown at the time of the merger, "All the individuals who expressed an interest in continued board involvement went on the Einstein board." (A.R. 146).

8

As a result of the merger, New Germantown assumed all assets[10] of Old Germantown, including Old Germantown's claim for a Medicare loss on a statutory merger, and Old Germantown's liabilities,[11] known and unknown.  Following the merger, New Germantown operated within the Einstein Health Network, instead of as an independent community hospital as Old Germantown had.  (A.R. 138).

The new entity, acting as Old Germantown's successor, filed a cost report with Medicare for the period ending August 31, 1997.  (A.R. 852).  Old Germantown claimed a loss of $15,435,695 on the disposal of assets through the merger with Einstein and claimed reimbursement for Medicare's share of the loss in the amount of $4,876,356, which was subsequently revised to $4,793,668.  (A.R. 1292).  The fiscal Intermediary, Mutual Omaha Insurance Company, issued a NPR denying the claimed loss on May 26, 1999. (A.R. 2575).  The Intermediary claimed that the merger was not a bona fide sale[12] and that it was a transaction between related parties based on the continued participation in the new entity of individuals who were associated with Old Germantown and the lack of bargaining at arm's length over the purchase price of the assets.  (A.R. 889-90).  The Intermediary explained that its review of the claim was done in accordance with the applicable regulations and guidelines, including "42

---

[10] Old Germantown's monetary assets were valued at $57.9 million (including endowment funds with a fair market value of $37.9 million.  (A.R. 178, 1292).  The parties did not have Old Germantown's non-monetary assets appraised prior to the merger, but an appraisal conducted the following year valued the non-monetary assets at $11.5 million. (A.R. 1193).

[11] Old Germantown's liabilities amounted to $34.2 million.  (A.R. 1292).

[12] The intermediary explained that "A reasonable and prudent arms length transaction would not expect to transfer Assets, valued (above) at near $60 million, for only the assumption of $30 million in liabilities."  (A.R. 890).

C.F.R. 413.134 as well as the Medicare Intermediary Manual, Section 4500 and the Provider Reimbursement Manual Chapters One and Fifteen." (A.R. 889-90).

The new entity appealed to the PRRB, who reversed the Intermediary's denial in a decision dated September 1, 2004. (A.R. 65). The Board found that there was no evidence to support a finding that common ownership or control existed among the parties prior to the merger. (A.R. 69). The Board noted that the issues covered in the Letter of Intent and Definitive Agreement address "precisely the types of issues one would expect to be raised during the negotiation and structuring stages of any merger of this type." (A.R. 69-70). Rejecting the notion of continuity of control used by the intermediary to deny the claim, the PRRB concluded that the plain language of the Statutory Merger Regulation bars application of the related party principles to the merging parties' relationship after the merger. (A.R. 70). As a factual matter, the Board found that the old board members who continued to serve on the surviving entity's board exercised severely limited power, since the controlling power was vested in AEHN. (A.R. 70).

The PRRB also rejected the Intermediary's argument that the transaction was not a bona fide sale or an arm's length transaction. (A.R. 71). The PRRB explained that the process leading up to the transfer of assets, i.e. request for proposals and utilization of a Letter of Intent and Definitive Agreement to cover all the terms of the planned merger, was consistent with the concept of an arm's length, bona fide negotiation. (A.R. 71). Accordingly, the PRRB allowed the loss claim, but required modification to the methodology used by Old Germantown to calculate the loss. (A.R. 71-72).

On October 28, 2004, the CMS Administrator reversed the PRRB's decision, disallowing the loss claim. (A.R. 2). The Administrator found that the parties to the transaction were related

10

through control.  (A.R. 21).  The CMS Administrator noted that application of the related party

principles at 42 C.F.R. § 413.417 requires an inquiry into whether the new entity's board

includes significant representation from the provider's board or management team because where

"such is the case, then no real change of control of the assets has occurred."  (A.R. 21).  The

Administrator also noted that control need not be legally enforceable, nor require majority

representation.  (A.R. 21). In light of these considerations, the Administrator found a number of

factors to support a finding that the parties were related both prior to and as a result of the

transaction.

        First, prior to the creation of New Germantown, Einstein and Old Germantown agreed to

preserve Old Germantown's senior management in the new entity, and following the merger, Old

Germantown's board members and management continued to hold top management positions.

(A.R. 22, 23).  Second, the new entity was created out of a contract between Old Germantown

and Einstein, and the terms of the merger were governed by that contract.  (A.R. 22).  Third, Old

Germantown exhibited strong identification with the new entity by structuring the transaction to

maximize Medicare depreciation recapture for New Germantown.  (A.R. 23).  Fourth, the

mission of the new entity was identical to Old Germantown's mission, who secured a

commitment of funds by Einstein in furtherance of that mission.  (A.R. 24).  Thus, the

Administrator found the merger to be between related parties because of the "significant

affiliation" between Old Germantown and New Germantown both before and after the

transaction.  (A.R. 24).

        The Administrator also denied the loss claim based on his finding that the transfer of

assets did not constitute a "bona fide sale" as required under 42 C.F.R. § 413.134(f)(2).  (A.R.

11

26-27).  The Administrator noted that there was no evidence of arm's length bargaining, "nor an attempt to maximize sales price as would be expected in an arm's length transaction." (A.R. 27). Noting that Old Germantown negotiated for the benefit of the new entity, the Administrator found that Old Germantown "was more concerned with community considerations and the future of the merged entity...rather than obtaining fair market value for its assets." (A.R. 28).  In addition, the Administrator pointed to Old Germantown's failure to follow up with the Primary proposal as evidence that Old Germantown was not primarily motivated by monetary concerns. (A.R. 28-29).  The Administrator noted that the large disparity between the asset values and the consideration received also indicated the lack of a bona fide sale.  (A.R. 29).

The CMS' Administrators decision constitutes the final administrative decision with respect to Old Germantown's claim for reimbursement.  Old Germantown has exhausted its administrative remedies and now seeks review in this Court.

## II.    STANDARD OF REVIEW

In determining which party is entitled to summary judgment, judicial review of the Agency's decision is governed by 42 U.S.C. §1395oo(f)(1), which incorporates the standard of review of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Under the APA, a court may set aside a final agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or when the action is "unsupported by substantial evidence" in the administrative record taken as a whole.  5 U.S.C. § 706(2)(A), (E); see also Monsour Medical Center v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986).

A reviewing court must give substantial deference to an agency's interpretation of its own regulations.  Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994).  The court's task

12

is not to decide which interpretation between conflicting views best serves the regulatory purpose, but rather to determine if the Secretary has reasonably interpreted his regulations. Id. The court "must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." Id. (quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)). Such broad deference is "particularly appropriate in the context of the complex scheme of Medicare reimbursement[.]" Monogahela Valley Hospital v. Sullivan, 945 F.2d 576, 593 (3d Cir. 1991); see also Thomas Jefferson Univ., 512 U.S. at 512 (explaining that broad deference is especially warranted where the regulation concerns a "complex and highly technical regulatory program" requiring significant expertise) (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 650, 697 (1991).

If an agency's findings of fact are supported by substantial evidence, a reviewing court lacks power to reverse either those findings or the agency's reasonable regulatory interpretations used in finding such facts. Monsour Medical, 806 F.2d at 1191; see also 5 U.S.C. § 706(2)(E). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mercy Home Health v. Leavitt, 436 F.3d 370, 380 (3d Cir. 2006) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In its review, the court should not consider the case *de novo* with regard to the Administrator, resolve conflicts in the evidence, or decide questions of credibility. Id.

## III.   DISCUSSION

Plaintiff argues that Old Germantown satisfied the requirements for a recognition of a loss on statutory merger as set forth in the Medicare regulations. Accordingly, Plaintiff requests

13

that the Court reverse the CMS Administrator's decision as arbitrary and capricious and unsupported by substantial evidence. Defendant requests that the Court affirm the decision of the Administrator. This Court will review the Administrator's decision to determine whether his findings that (1) the merger was a related party transaction, and (2) the merger was not a bona fide sale are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "unsupported by substantial evidence[.]" 5 U.S.C. § 706(2)(A), (E).

A.    **The Administrator's Interpretation of the Related Party Regulations**

The Administrator found that the parties to the merger were related and thus, Old Germantown could not claim a loss arising from the transfer of its assets in the merger. Plaintiff argues that the Administrator's decision cannot be reconciled with the plain language of the Statutory Merger Regulation, which states that in order for a loss to be recognized, the merger must be "between two corporations that are unrelated." Plaintiff alleges that since the merger was between Old Germantown and pre-merger New Germantown, post-merger New Germantown is irrelevant to the analysis of whether the parties to the transaction are related. Plaintiff also argues that an interpretation of the Related Party Rule that requires an inquiry into the post-transaction relationship is both unreasonable and inconsistent with prior agency interpretations. Plaintiff's arguments are unpersuasive.

The Administrator noted that in applying the Related Party Rule, consideration must be given to whether the composition of the board of New Germantown included significant representation from the provider's board or management. (A.R. 21). Such an interpretation is both reasonable and consistent with prior agency statements. The Statutory Merger Regulation provides that only a merger between unrelated parties can qualify for a depreciation adjustment.

14

42 C.F.R. § 413.134(k)(2).  The regulation explicitly references 42 U.S.C. § 413.17 to define

relatedness.  Id.  Under § 413.17, relatedness can be exhibited by control, i.e. where an

organization "has the power, directly or indirectly, significantly to influence or direct the actions

or policies of an organization or institution." 42 U.S.C. § 413.17(b)(3).  Relying on this

language, the Administrator noted that where the new entity included significant representation

from the provider's board or management team, no real change of control has occurred and no

gain or loss will be recognized.  (A.R. 21).

In support of the Administrator's interpretation, the Secretary relies upon Medical Center

of Independence v. Harris, 628 F.2d 1113 (8th Cir. 1980), HCFA Ruling 80-4 (A.R. 2387-90),

and Program Memorandum A-00-76 (A.R. 2281-84).  In Medical Center of Independence, the

Eighth Circuit affirmed the district court's denial of Medical Center of Independence's ("MCI")

Medicare reimbursement claim for certain expenses resulting from a long term lease and

management agreement with Hospital Affiliates International, Inc. ("HAI").  629 F.2d at 1114-

15.  HAI purchased the assets of a hospital and entered into a 15 year lease with MCI and a

management agreement to run concurrently with the lease. Id. at 1115.  Under 42 C.F.R. §

405.427 (1979), the materially identical predecessor to 42 U.S.C. § 413.17, reimbursement of the

provider's expenses was limited if the provider was related to the party with which it had

contracted.  Id.

The Commissioner, in applying  42 C.F.R. § 405.427, found that HAI's power to control

MCI was sufficient to make them related organization within the meaning of the regulation.  Id.

at 1116.  The Eighth Circuit concluded that there was substantial evidence in the record to

demonstrate HAI's power to control MCI.[13]  Id. at 1118.  The court explained that "While the absence of any prior relationship between the parties is certainly relevant to the issue of control, it is insufficient to establish a per se rule barring application of the related party principle...In our view, the power of control over MCI enjoyed by HAI since 1970 cannot be rigidly separated from the terms of their agreements."  Id. at 1119.

Put simply, Medical Center of Independence held that, under the particular facts, a contract could confer sufficient control by one party over another to create a related party transaction.  The Secretary adopted the reasoning of Medical Center of Independence in 1980 through HCFA Ruling 80-4. Jeanes Hospital v. Leavitt, 453 F.Supp.2d 888, 897 (E.D. Pa. 2006) (citing to North Iowa Medical Center v. Dept. of Health and Human Svcs., 196 F.Supp.2d 784, 793 (N.D. Iowa, 2002)).  On October 19, 2000, CMS issued Program Memorandum A-00-76 ("PM A-00-76").[14]  (A.R. 2281).  In PM-A-00-76, the Secretary cited with approval to HCFA Ruling 80-4 and reiterated this policy explicitly in regard to non-profit consolidations. (A.R. 2282).  PM-A-00-76 explained that, in applying the related organizations principle at 42 CFR 413.17, "[I]t is appropriate to compare the governing board/management team composition before the transaction with the governing board/management team composition after the transaction, even though there was no contemporaneous co-existence of those boards/teams."

---

[13]  The court highlighted the following facts: (1) HAI had six representatives on MCI's 14 member board; (2) two HAI officials were elected to serve as vice-president and assistant secretary of MCI; (3) MCI's administrator became an employee of HAI; (4) only HAI could cancel the lease agreement; and (5) if the lease agreement were cancelled, HAI would assume all of MCI's assets and liabilities.  Med. Ctr. of Independence, 628 F.2d at 1118.

[14]  As Plaintiff points out in its Memorandum, the record contains the version of the Program Memorandum issued August 7, 2001 (A.R. 2281-84).  However, its terms are identical to the Program Memorandum issued October 19, 2000. (Pl. Mem. (Docket No. 21) at 14)

(A.R. 2282). Furthermore, when evaluating relatedness, the focus should be whether

significant[15] control exists between the transferring parties. (A.R. 2282). The following example

was provided:

> Corporation A and Corporation B, both non-profit providers, are combined by
> statutory merger with Corporation A surviving. Corporations A and B were
> unrelated prior to the transaction, each being controlled by its respective Board of
> Directors of ten members each. After the merger, Corporation A's new ten
> member Board of Directors includes five individuals that served on Corporation
> A's pre-merger board, and five individuals that served on Corporation B's pre-
> merger board. Thus, Corporation A's new Board of Directors includes a
> significant number of individuals from both of the former entities' boards.
> Because no significant change of control of the assets of former Corporation B has
> occurred, the transaction as between Corporation A and Corporation B is deemed
> to be between related parties and no gain or loss will be recognized as a result of
> the transaction.

(A.R. 2282). In light of Medical Center of Independence, HCFA Ruling 80-4, and PM-A-00-76,

it was reasonable for the Administrator to look at the relationship of the parties both prior to and

following the merger in determining whether the merger was a related party transaction.

Plaintiff argues that the reasoning of Medical Center of Independence does not apply to

Old Germantown's merger into New Germantown. Plaintiff points to the fact that the merger,

unlike the on-going contractual relationship created in Medical Center of Independence, was a

one-time transaction. (Pl. Reply, Docket No. 24, at 17). Further, upon the merger, Old

Germantown ceased to exist and thus was incapable of continuing its relationship with the new

entity. However, such a distinction was recently rejected in Jeanes Hospital v. Leavitt, involving

---

[15] PM A-00-76 lists considerations in evaluating control including: (1) the determination
of common control is subjective, i.e. no rule of thumb; (2) each situation must be examined on its
own facts and merits; (3) a finding of common control does not require 50 percent or more
representation; and (4) control need not be actually exercised, the mere potential to control is
sufficient. (A.R. 2282)

the merger of Jeanes Hospital into a newly created subsidiary of Temple University Health System. 453 F. Supp.2d at 899. In reviewing the provider's claim for depreciation reimbursement, the court held that "in a one-time transaction such as a non-profit-entity merger, related party analysis under 42 C.F.R.§§ 413.134 and 413.17 must include not only a review of the relationship between the merging parties, but also a review of the relationships between the merging parties and the surviving entity." 453 F. Supp.2d at 899. See also N. Iowa Med. Ctr., 196 F. Supp. 2d at 794 (noting that while a one time transaction can create a related party relationship, the transaction at issue did not).

Plaintiff argues that the Secretary's "continuity of control" approach to relatedness is not due deference by this court because it is a departure from previously established agency policy.[16] Plaintiff also challenges the reliance placed on PM-A-00-76 due to the fact that it was an informal statement of agency policy, not subject to the procedural safeguards of the APA. Neither of these arguments have merit.

As discussed above, PM-A-00-76 is consistent with prior agency decisions as evidenced by Medical Center of Independence and its subsequent adoption through HCFA Ruling 80-4. In addition, PM-A-00-76 clearly states that it "does not include any new policies regarding mergers

---

[16] In support of its argument, Plaintiff points to evidence including, the Booth letter (A.R. 875-76); the Goeller letter (A.R. 1093-94); the Medicare Intermediary Manual ("MIM") § 4502.6 (A.R. 1588); and testimony of former CMS officials involved in the creation of the regulations (A.R. 184-85, 187-88, 197-200). After careful review, this Court concludes that this evidence is insufficient to compel an alternative reading to the one put forth by the Secretary, especially in light of the Court's finding that the Secretary's interpretation of the related party regulation is a reasonable one. Thomas Jefferson Univ., 512 U.S. at 512 (noting that the court "must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.").

or consolidations involving non-profit entities" and that the clarification is to be applied to all NPRs not yet issued. (A.R. 2284). While this language alone may not have been enough to insulate the policy from retroactive rulemaking challenges, such arguments have been rejected by courts in this district. Jeanes Hospital, 453 F.Supp.2d at 899 (noting that it was irrelevant that the Agency did not issue its formal interpretations about 42 C.F.R. §§ 413.134, 413.17 until after the merger at issue because the interpretation was consistent with prior agency decisions); Lehigh Valley Hospital-Muhlenberg v. Leavitt, 2006 WL 2547061, at *4 (E.D. Pa. Aug. 31, 2006) (explaining that since PM A-00-76 merely provides clarification, the PRRB's reliance on it does not constitute retroactive rulemaking).

Finally, the Administrator's interpretation of the related party rule is consistent with the reality of mergers and purpose of related party requirement. The Eighth Circuit, in Medical Center of Independence, noted that the related organization principles "serves to screen out both costs not actually incurred and unreasonable costs. That is to say, the regulation precludes reimbursement for cost increases due solely to transactions between different parts of a single economic unit, and it polices 'sweetheart' contracts with suppliers that may inflate costs to the providers." 628 F.2d at 1119. Although the regulation serves as a "prophylactic rule barring the reimbursement of presumptively unreasonable costs," this does not relieve the Secretary of the responsibility to establish by substantial evidence its applicability to the facts of a particular case. Id. at 1190-20.

In light of the above discussion, the Administrator reasonably interpreted the Related Party Rule as requiring an examination of the relationship between all the parties to the transaction, i.e. the merging entities and the newly formed entity resulting from the merger.

## B.     The Administrator's Finding that the Parties Were Related

As discussed above, a reviewing court's task is limited to determining if the Administrator's factual findings are supported by substantial evidence. In its review, the Court is mindful that, "overall this test is deferential" and where agency inferences are supported by substantial evidence, deference is due even if this court acting *de novo* would have reached a different conclusion. Monsour Med. Ctr., 806 F.2d at 1190-91. Based on a review of the record as a whole, the Court finds that substantial evidence supports the Administrator's conclusion that the merger was a related party transaction.

The Administrator concluded that the parties were related by "control" and "significant affiliation" both before and after the merger. As support for his conclusion, the Administrator highlighted the following as evidence of Old Germantown's expectation that the transaction was "but a continuation of the Provider in another form[:]" (1) the identical missions between Old and New Germantown; (2) the continuation of Old Germantown's senior management, board members and employees at New Germantown; (3) the agreement to commit funds in furtherance of continued community access to healthcare; and (4) structuring the transaction to maximize Medicare reimbursement for New Germantown. (A.R. 23-24). These factors, when viewed in combination, constitute substantial evidence in support of the Administrator's conclusion.

Most notably, there was significant carryover of Old Germantown's board members and management. 15% of the board of New Germantown came directly from Old Germantown's Board, and an additional twelve members (30%) were appointed from the Germantown community. (A.R. 136, 605). In fact, all the individuals who expressed an interest in continued board involvement were given positions on the Einstein board. (A.R. 146). Moreover, the senior

20

management of Old Germantown remained intact as its president, board chairman, and board vice-chairman assumed the same positions with New Germantown. (A.R. 2247). Finally, both parties to the merger intended to structure the board in a manner that would permit the maximum amount of recapture under the Medicare Program. (A.R. 572). Although this is entirely permissible, it lends support to the Administrator's conclusion that the new entity was a continuation of the Provider in another form.

Plaintiff responds that none of the community members had previously served on the Old Germantown Board, their appointments ultimately required the approval of the AEHN Executive Committee, and there is no evidence that the community members were or could be controlled by board members from Old Germantown's Board. Plaintiff also argues that the significance given to the carryover board members and management is exaggerated in light of the fact that New Germantown operated within the much larger Einstein Health Network.

In support of its position, Plaintiff point to Jeanes Hospital, which also involved the merger of a hospital provider into another entity which assumed the provider's assets and liabilities. 453 F. Supp.2d at 890. In that case, despite carryover board members holding a 47% voting interest following the merger, the court found that significant control did not exist. Id. at 902. The court explained that because the new entity was part of a larger health system comprised of twelve to fifteen other entities, the degree of control had to be evaluated in relation to the parent corporation. Id. Due to the carryover board members' diluted level of control relative to the parent, as well as terms of the merger structured specifically to limit the powers of

21

carryover members,[17] the court held that a finding of "significant control" was not supported by substantial evidence. Id.

While this case presents an analogous parent-subsidiary relationship, here the Administrator's finding of control was not based solely on the existence of carryover board members and management. Rather, there was additional evidence supporting a finding of control. For example, Old Germantown acted to further the interests of the new entity by securing a commitment of funds from Einstein to be expended on the continuation of Old Germantown's mission in the new entity. (A.R. 573, 604). David Ricci testified that Old Germantown made no attempt to get the $6 million pledged by Einstein as part of the sale price for Old Germantown. (A.R. 145). In light of this additional evidence, viewed in conjunction with the overlap in board members and management, it was reasonable for the Administrator to conclude that Old Germantown's interests were "recast in a different form" and no loss was actually incurred that could be recognized under the Medicare program. (A.R. 24). Therefore, after a review of the record as a whole, the Court finds that substantial evidence supports the Administrator's conclusion that the merger was a related party transaction.

### C.     The Administrator's Interpretation of the Bona Fide Sale Requirement

Although the Court has determined that the Administrator properly denied the loss claim on related party grounds and thus it need not reach the bona fide sale inquiry, it will briefly address this for completeness. In his decision, the Administrator explained that in order for a loss to be recognized, a transaction resulting in the transfer of depreciable assets must meet one

---

[17] The court noted testimony that Jeanes Hospital "gave up essentially all of the strategic control and all of the day-to-day operational control in terms of what really mattered in running a business." 453 F.Supp.2d at 901.

of the applicable criteria of 42 C.F.R. § 413.134(f).  (A.R. 26).  The Administrator found that the transfer of assets did not qualify as a bona fide sale as required by paragraph (f)(2).  (A.R. 26-27).

Plaintiff argues that paragraph (f)(2) has no applicability to statutory mergers and as of the date of the loss and disallowance, there was no Medicare policy that required statutory mergers between unrelated entities to satisfy requirements for a bona fide sale.  Alternatively, the Plaintiff challenges the Administrator's interpretation of the phrase "bona fide sale," asserting that the transfer of Old Germantown's assets does constitute a bona fide sale.

The Administrator's requirement that a transaction qualify as a bona fide sale is reasonable and consistent with the language of the Medicare regulations.  As previously mentioned, the Statutory Merger Regulation specifically references 42 C.F.R. § 413.134(f), stating, "If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation."  42 C.F.R. § 413.134((k)(2(i).  A reasonable interpretation of this provision is that recognition of a loss resulting from a statutory merger is only permitted if otherwise allowed under paragraph (f).  Under paragraph (f), the treatment of the gain or loss depends upon the manner of disposition of the asset.  42 C.F.R. § 413.134(f)(1).  Paragraphs (f)(2) though (f)(6) identify the specific means through which a depreciable asset can be disposed including, bona fide sale or scrapping; exchange, trade-in or donation; demolition or abandonment; or involuntary conversion.  Id. at § 413.134(f)(2)-(f)(6).  Of all the circumstances listed, the disposition most applicable to the present case is the bona fide sale requirement.

Plaintiff's argument – that the only requirement for recognition of a loss on a statutory merger is that the parties be unrelated – is belied by recent cases in this District which have

23

required that a transaction be a bona fide sale in order to be eligible for reimbursement.  In <u>Jeanes</u>

<u>Hospital</u>, which involved a statutory merger, the court explained:

> [I]n determining whether a provider will be reimbursed for depreciation expense
> under Medicare, the CMS applies a two-pronged test.  The first question is
> whether the parties are "related parties" or "unrelated parties" under the Medicare
> regulations.  If the parties are related, they cannot engage in a bona fide sale and
> the analysis ends.  If the parties are unrelated, however, the second question is
> whether the parties engaged in a bona fide sale.  If the parties engaged in a bona
> fide sale, then a reimbursement for adjusted depreciation costs is proper.

453 F.Supp.2d at 893 (citations omitted); <u>see also</u>  <u>Lehigh Valley Hopital - Muhlenberg</u>, 2006

WL 2547061, at *2, *7 (upholding PRRB decision denying reimbursement for a loss on sale

based on the provider's failure to demonstrate that transaction was a bona fide sale).  In addition,

PM-A-00-76, which was issued to clarify application of the Medicare Regulations to non-profit

mergers, makes explicit that recognition of a gain or loss for Medicare purposes depends on

whether the transfer of assets resulted from a bona fide sale as required by 42 C.F.R. §

413.134(f).  (A.R. 2281, 2283).   Based on the language of the regulations itself, as well as

subsequent interpretations of the regulations by CMS and courts in this district, the Court

concludes that the Administrator reasonably interpreted the Medicare Regulations as requiring

that a transaction be a bona fide sale in order to be eligible for reimbursement.

### D.      The Administrator's Finding that the Merger Was Not a Bona Fide Sale

Once a merger is found to be a related party transaction, the loss claim is disallowed and

no further analysis is necessary.  However, in this case, the Administrator denied the claim on the

additional grounds that the transfer of assets did not meet the regulatory requirement of a "bona

fide sale."  The Administrator found that there was no evidence of arm's length bargaining, nor

an attempt to maximize the sale price as would be expected in an arm's length negotiation.  (A.R.

24

27).  Noting that Old Germantown negotiated for the benefit of the new entity, the Administrator found that Old Germantown "was more concerned with community considerations and the future of the new entity...rather than obtaining fair market value for its assets."  (A.R. 28).  He explained that the large disparity between the asset values and the consideration received reflected the lack of arm's length bargaining and thus the lack of a bona fide sale.  (A.R. 29).

Plaintiff takes issue with the Administrator's interpretation of bona fide sale, arguing that the transaction satisfied the requirements of a bona fide sale, as previously defined by Medicare. Plaintiff asserts the merger was a sale made in good faith, for valuable consideration, with no defect in title, between unrelated parties, and thus a bona fide sale.  Contrary to the Secretary's position, Plaintiff claims that "fair market value" is not a requirement for recognition of a loss on a statutory merger.  However, so long as an agency's findings of fact are supported by substantial evidence, a reviewing court lacks power to either reverse those findings or the agency's reasonable regulatory interpretations used in finding such facts.  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986).  While Plaintiff makes some persuasive arguments, the Administrator reasonably interpreted the regulations as requiring a bona fide sale for recognition of a loss and the record sufficiently supports the Administrator's conclusion that the merger does not qualify.  Some of this evidence is highlighted below.

For example, the Administrator noted that Old Germantown was more concerned with community considerations and the future of the merged entity in the community rather than obtaining fair market value for its assets.  (A.R. 28).  Support for this conclusion can be found in the language of the RFP which noted, as one of Old Germantown's principal objectives, its desire to ensure that it continues to serve the heath care needs of its community - a desire subsequently

25

bourne out by Einstein's $6 million commitment of funds in the Definitive Agreement. (A.R. 497, 604). David Ricci conceded that Old Germantown made no attempt to get this $6 million as part of the sale price for Old Germantown, as opposed to allocating it to the new entity. (A.R. 145).

The Administrator also found that the large disparity (approximately $32 million) between the asset values and the consideration received reflected the lack of arm's length bargaining and thus the lack of bona fide sale. (A.R. 29); see also Lehigh Valley Hosp.-Muhlenberg, 2006 WL 2547061, at *11 (citing with approval to Germantown Hosp. and Med. Ctr. v. Mutual of Omaha Ins. Co.[18], 2004 WL 3049341, at *17 (P.R.R.B. Oct. 28, 2004)). Plaintiff disputes the scale of the discrepancy and argues that the value received by Old Germantown – assumption of its known and unknown liabilities – was fair compensation because that was the value ascribed to the transaction by the market.[19] Nonetheless, while the record may not provide the clearest picture as to the value transferred in the merger, there is sufficient evidence to support the Administrator's claim of disparity.

---

[18] This is the CMS Decision in the present case. Two Eastern District cases cite it for the proposition that bona fide sale analysis, in the context of non-profit mergers, requires a comparison of the sales price with the fair market value. Jeanes Hosp., 453 F.Supp.2d at 903; Lehigh Valley Hosp.-Muhlenberg, 2006 WL 2547061, at *5.

[19] Old Germantown received three proposals, one each from Primary Health System, Temple University and AEHN. (A.R. 523-28, 530-32, 534-58). Old Germantown rejected Primary's proposal because Old Germantown questioned its ability to use its endowment funds to pay off its liabilities, and thus did not consider Primary's offer a realistic possibility. (A.R. 127). This left the proposals from AEHN and Temple, and both proposed the merger of Old Germantown into a subsidiary which would assume all of its assets and liabilities. (A.R. 532, 539). In regard to Old Germantown's attempts to seek additional consideration for the merger, David Ricci explained "[k]nowing that we only had two proposals there was nothing else in the market place that we could go to to try to drive up in a negotiation with both parties the value[.]" (A.R. 144).

The evidence shows that Old Germantown's monetary assets were valued at $57.9 million (including endowment funds of $37.9 million).  (A.R. 178, 1292).  An appraisal conducted subsequent to the merger valued the non-monetary assets at $11.5 million.  (A.R. 1193).  On the other hand, Old Germantown's liabilities amounted to $34.2 million.  (A.R. 1292).  Based on these figures, Old Germantown surrendered $69.4 million in assets for Einstein's assumption of $34.2 million in debt.

In evaluating the sufficiency of the evidence, the Court is mindful that it's task is not to consider the case *de novo*, nor to resolve conflicts in the evidence.  Mercy Home Health, 436 F.3d at 380.  Because there is sufficient support in the record that the transaction was not a bona fide sale, the Administrator properly denied the Plaintiff's claim for reimbursement.

### E.    Additional Challenges to the Administrator's Decision

Plaintiff also makes the following arguments: (1) that disallowance of Old Germantown's loss resulted from an impermissible new rule;[20] (2) the Administrator's decision reflects prohibited retroactive rulemaking; (3) Old Germantown was entitled to Notice of CMS's policy under administrative law; and (4) the Administrator's decision is contrary to Old Germantown's due process rights.  Generally, Plaintiff is arguing that the Secretary's continuity of control and bona fide sale positions conflict with the Statutory Merger Regulation's plain terms and/or prior interpretations, thus effectively resulting in a new regulation, which was issued contrary to numerous statutory safeguards.  However, as previously discussed at length, the Secretary's interpretation of the relevant Medicare regulations are both reasonable and consistent with the

---

[20]   Plaintiff challenges the Secretary's determination as contrary to the Small Business Regulatory Enforcement Fairness Act of 1996 ("Congressional Review of Agency Rule Making Act" or "CRA"), 5 U.S.C. § 801 *et seq.* and Administrative Procedure Act ("APA").

language of the regulations and prior interpretations issued by the agency. While the Court rejects Plaintiff's arguments for the aforementioned reasons, an additional word is merited below.

Plaintiff specifically challenges any reliance on PM-A-00-76 as an instance of retroactive rulemaking and argues that because Old Germantown did not have notice of the policies contained therein, it cannot be bound by them. However, as previously noted, PM-A-00-76 merely provided clarification of the application of the Medicare Regulations in the non-profit context. As a result, the Administrator properly relied on it in determining whether Plaintiff was entitled to reimbursement. Moreover, CMS was not required to submit its interpretation for notice and comment or publication because as a clarification of existing regulations, as opposed to the enactment of a new rule, it was not subject to the procedural requirements of the APA or the Medicare Act. Via Christi Reg. Med. Ctr. v. Leavitt, 2006 WL 2773006 (D. Kan. Sept. 25, 2006); Lehigh Valley Hosp.-Muhlenberg, 2006 WL 2547061 at *4; see also Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 99 (1995) (interpretative rules do not require notice and comment under the APA).

## IV.    Conclusion

For the foregoing reasons, the Court concludes that the Administrator's denial of Old Germantown's loss claim was not arbitrary or capricious and his findings were supported by substantial evidence. The Administrator reasonably interpreted the Medicare Regulations as requiring mergers to be between unrelated parties and that assets be exchanged in a bona fide sale. Therefore, the Court grants Defendant's Motion for Summary Judgment. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALBERT EINSTEIN MEDICAL        :
CENTER, INC., successor in interest :
to Germantown Hospital and Medical :
Center, Inc.,                   :
                                :
            Plaintiff,          :
                                :   CIVIL ACTION NO. 04-6059
        v.                      :
                                :   **FILED**
MICHAEL O. LEAVITT, as Secretary :
of the United States Department of :
Health and Human Services,      :        AUG − 1 2007
                                :
                                :   **MICHAEL** E. KUNZ, Clerk
            Defendant.          :   **By**_____Dep. Clerk

## ORDER

AND NOW, this _31_ day of July, 2007, upon consideration of Plaintiff's Motion for

Summary Judgment (Docket No. 20), Defendant's Cross-Motion for Summary Judgment

(Docket No. 22), Plaintiff's response thereto (Docket No. 24), Defendant's reply (Docket No.

27), Defendant's Notice of Supplemental Authority (Docket No. 28), Plaintiff's response thereto

and Notice of Supplemental Authority (Docket No. 29), Defendant's Second Notice of

Supplemental Authority (Docket No. 30), Plaintiff's Second Notice of Supplemental Authority

(Docket No. 31), and Defendant's Third Notice of Supplemental Authority (Docket No. 32). it is

hereby **ORDERED** that Defendant's Motion is **GRANTED**, Plaintiff's Motion is **DENIED**.

Judgment is entered on behalf of the Defendant, Secretary of Health and Human Services, and

against Plaintiff, Albert Einstein Medical Center, Inc.

29

This case is now **CLOSED**.

BY THE COURT:

RONALD L. BUCKWALTER, S.J.